**TURNER COUNTY, S. D. v. MILLER.**

No. 13727.

United States Court of Appeals
Eighth Circuit.

Dec. 2, 1948.

Rehearing Denied Dec. 27, 1948.

M. T. Woods and H. L. Fuller, both of Sioux Falls, S. D., and L. L. Madsen, of Parker, S. D., for appellant.

Davenport, Evans & Hurwitz, of Sioux Falls, S. D., for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from a judgment for the plaintiff (appellee) entered upon the verdict of a jury in an action which he brought against Turner County, South Dakota, to recover for personal injuries resulting from a collision of his automobile with a bridge maintained by the County in connection with its highway system. Jurisdiction was based on diversity of citizenship.

The accident occurred shortly prior to one o'clock on the morning of March 3, 1946, while the plaintiff was driving his car east across the bridge. Attributing the accident to the collapse of the bridge, he filed a claim against the County based on § 28.0913 of the South Dakota Code.[1] He asserted in his claim that the bridge had become out of repair to such an extent as to endanger the safety of public travel; that the governing body of the County had notice of this dangerous condition more than twenty-four hours before the bridge collapsed, but did not cause to be erected guards across the highway as required by law; and that the County's failure in this regard caused the accident and plaintiff's resulting injuries. The County rejected the claim, and the plaintiff brought this action upon it.

In its answer, the County admitted that the bridge was a part of its highway system; that on March 3, 1946, the plaintiff operated a motor vehicle upon the bridge; that the bridge collapsed; and that he had filed a claim against the County, which was rejected. The County denied that the collapse of the bridge was due to any act or omission on its part. It charged that the negligence of the plaintiff in the operation of his automobile caused the collapse of the bridge, and that any injuries he sustained were the result of his own negligence.

Upon the trial, the controverted issues of fact were:

1. Had the bridge become out of repair to such an extent as to endanger the safety of public travel?

2. Did the Board of County Commissioners have constructive notice of the alleged dangerous condition of the bridge more than twenty-four hours prior to the collapse?

---

[1] "§ 28.0913. In case any highway, culvert, or bridge shall become in whole or in part destroyed or out of repair by reason of floods, fires, or other cause to such an extent as to endanger the safety of public travel, it shall be the duty of the governing body or board under statutory duty to maintain such highway, culvert, or bridge upon receiving notice thereof to cause to be erected for the protection of travel and public safety, within twenty-four hours thereafter, substantial guards over such defect or across such highway of sufficient height, width, and strength to guard the public from accident or injury and to repair the same within a reasonable time thereafter. It shall also be the duty of such governing body or board to guard any abandoned public highway, culvert, or bridge in like manner.

"Any person who shall sustain injury to person or property by reason of any violation of this section shall have a cause of action against the county, township, city, or town as the case may be for such damages as he may have sustained."

3. Was the failure of the County to erect guards or barricades, in order to stop traffic over the bridge, the proximate cause of the accident?

4. Was the plaintiff negligent in the operation of his automobile, and did his negligence, if any, cause or contribute to the happening of the accident?

5. What damages, if any, was the plaintiff entitled to recover?

The errors asserted by the County on this appeal relate to the refusal of the District Court to direct a verdict for the County and to various rulings and instructions of the court during the trial which it is contended made the trial unfair and imposed a liability upon the County in excess of its statutory liability.

■ The substantive law applicable to this case is that of South Dakota. The applicable procedural law is that of the United States. It is conceded that the liability of a county of South Dakota for injuries resulting from defects in a bridge or highway is purely statutory, and that § 28.0913 of the South Dakota Code is the controlling statute. See Williams v. Wessington Township, 70 S.D. 75, 14 N.W.2d 493; Vesely v. Charles Mix County, 66 S.D. 570, 287 N.W. 51; Pederson v. Canton Township, S.D., 34 N.W.2d 172, 174; Jackson County, S. D., v. Dufty, 8 Cir., 147 F.2d 227, 228; Minnehaha County, S. D., v. Kelley, 8 Cir., 150 F.2d 356, 358.

The factual situation out of which this controversy arose was, in substance, as follows:

The scene of the accident was about one and a half miles northeast of Parker, South Dakota, where the bridge in suit carries a graveled east-west highway across the Vermillion River, a shallow stream. The bridge is of the steel truss type. Two end posts or slant chords on each side of the bridge rest on piers and support steel girders, which are fastened to the top of these end posts. Vertical members extend downward from the girders to furnish support for the steel I-beams or transverse members upon which the floor or deck of the bridge is laid. These I-beams are attached to the lower ends of the vertical members by hanger plates. The I-beams support wooden stringers to which planks, laid crosswise, are spiked to furnish the floor of the bridge. On each side of the bridge eye-bars extend from the base of each end post to the base of the other, in order to prevent the end posts from spreading longitudingly. The entire weight of the bridge is borne by the end posts. There were suitable cross bracings near the top of the end posts, and cross-members and eye-rods extending from the top of one girder to the top of the other to hold the truss structure intact. There was also cross bracing under the floor of the bridge between the transverse beams or I-beams, to prevent side sway. The bridge proper was 99 feet long, and with its approaches was 144 feet 8 inches in length. The floor was about 15 feet 6½ inches wide. The approach span west of the bridge proper was 30 feet 2 inches from the bank of the stream to the west piers of the bridge. The approach span on the east side of the bridge was 15 feet 6 inches long. The floor of the bridge was approximately 12 feet above the ground at the edge of the stream.

The I-beams or transverse members supporting the floor of the bridge, which were attached to the hanger plates which were in turn attached to the vertical members of the bridge, were about 16 feet 9 inches long. The I-beams were spaced 16 feet 6 inches apart. There were five of these beams under the floor of the bridge proper. At the time of the trial, for convenience, the points at which the beams were located were numbered 1 to 5, starting from the east end of the bridge. Each panel of flooring from I-beam to I-beam consisted of fourteen 3x12 stringers 18 feet long, to which were spiked 3x12 planks 15 feet 6½ inches long. The stringers overlapped each other at the I-beams, and one series of stringers was spiked to the adjoining series, where they overlapped, by large spikes and were also held together by the floor planks where the ends of the stringers overlapped each other. The structural adequacy of the bridge, if kept in good condition and repair, was unquestioned.

On March 3, 1946, the plaintiff left Parker, South Dakota, in his Ford automobile to go to his parents' farm, which

was northeast of the bridge in suit. This was shortly after midnight. Edward Konda, the plaintiff's brother-in-law, accompanied him. The plaintiff was driving. As the plaintiff approached the bridge, his brother, Willard Miller, who had left Parker at about the same time, was driving a Chevrolet automobile close behind the plaintiff's car.

The plaintiff's testimony as to what occurred when his car was on the bridge is as follows:

"* * * As I reached and actually drove onto the bridge my speed was somewhere between thirty and thirty-five miles an hour. On the first part of that bridge I did not have any difficulty of any kind. I had my car under control. I did not hit or strike any part of that structure until I was at least half way across it. Nothing out of the ordinary occurred until I was about half way over. Then it kind of felt like the floor had went out from under and skidded to the side. It tipped to the south a little like it gave out from under me going down. The floor gave out from under me. It acted like it was tipping towards the south, towards my right. Those two motions, the feeling like the floor was giving and tipping to the right came very close together. The next thing I remember was a big bump.

"Q. How close did that come to the sensation you have described of the floor giving way and tipping to the right? How close together? A. I would say in a matter of seconds. Less than a second.

"Q. Each of them were right together, practically, were they? A. Yes.

"It was a very hard bump, seemed like the spring hit the axle. It threw the steering wheel out of my hand. The steering wheel gave a pull and twisted. I lost hold of it. The character or type of that bump after I felt the floor give way and turn to the right, I felt the axle hit the frame. It was awful hard. The bump jarred the car. Then I felt that twist on the steering wheel and lost hold on the steering wheel. I don't know what happened then. That is the last I remember. I lost control of my car when I lost hold of the steering wheel. I don't remember

regaining it after that. That is the last I remember."

Edward Konda testified that as the plaintiff's car was about two-thirds of the way across the bridge, traveling at a speed of from 35 to 40 miles an hour, "there was a sharp bump just like a washout in the road"; that this was at the point numbered 2 (where the second I-beam west of the east piers of the bridge was located). He also testified that he did not personally feel "any tipping to the right"; that he felt as though he was "going down into a washout—a dip," and that he also felt a bump like the body hit the X" [axle]; that the "dip" and the "jounce" came close together; that the next he remembers he was back of the car on the ground; that the car "had come to a stop on the east end of the bridge, crosswise, by the stone abutment"; that the car was facing north; that the bridge was down; that the Willard Miller car was "sort of balanced over the south side of the bridge." ·

Willard Miller, the driver of the Chevrolet car which was close behind the plaintiff's car at the time the accident occurred, testified, in substance, that the Chevrolet was 100 to 150 feet behind the Ford driven by the plaintiff; that he (Willard Miller) was traveling between 30 and 40 miles an hour; that he did not notice anything out of the way about the movement of the plaintiff's car as it entered upon the bridge; that the plaintiff's car was not moving from side to side; that "while it was crossing the bridge about two-thirds of the way across, it took a big jump and then it flew from side to side after that." Willard Miller also testified that he saw this before his car had reached the bridge, and that, as he drove on the bridge, the floor looked all right and seemed to be in position; that when his car was "a little over half or two-thirds of the way" across the bridge, the car started going down with the bridge; that the bridge "was broke down," the floor "was down, down in the river"; that he applied the brakes when he noticed the dip; that he lost control of the car; that the last he saw of the plaintiff's car before he (Willard Miller) came to a stop, it was crosswise between the two abutments at the east end of the bridge; that when he (Wil-

lard Miller) "woke up," his car was hanging crosswise over the south side of the bridge about at the first I-beam west of the piers at point 1.

The testimony of Arthur D. Anderson, who was in the Chevrolet car with Willard Miller, substantiated the testimony of Willard Miller as to the movements of the two cars upon the bridge and its collapse.

The undisputed evidence shows that the plaintiff's car came to rest between the two east masonry abutments of the bridge. The car was badly damaged. The southeast abutment of the bridge had been knocked down toward the east. The southeast corner post of the bridge had been bent or had buckled close to its base. The Willard Miller car had struck the vertical rods which supported the hanger plate which in turn supported the south end of the I-beam at point 1, being the first I-beam west of the easterly piers of the bridge. The section or panel of the flooring between the piers and the first I-beam was slanting toward the water. Willard Miller's car was hanging over the south edge of this flooring. The vertical rods which the car had struck were bent over its windshield and top. The floor of the bridge from point 1 to point 2 and from point 2 to point 3 was level and about four to six inches above the water. From point 3 the floor slanted up toward the west to the west piers. The bridge had toppled over toward the south.

After the collapse of the bridge, it was found that the hanger plate which supported the south end of the I-beam at point 2 was broken. If this hanger plate broke before or while the plaintiff's car was upon the bridge, 33 feet of the floor, weighing about 10,000 pounds, was without any center support. The evidence of the plaintiff unquestionably tended to prove that this portion of the floor of the bridge sagged or dipped beneath his car, throwing it out of his control. The plaintiff's experts expressed the opinion that the hanger plate broke because of metal fatigue, visible evidence of which must have been observable for several years before this accident occurred, that the break occurred while the plaintiff's car was crossing the bridge, and accounted for the sag-

ging of the bridge floor, to which the plaintiff and his witnesses had testified.

The County's evidence tended to prove that the plaintiff was driving at a speed of about 55 miles an hour; that his car was out of control when it went upon the bridge; that the car struck the sides of the bridge several times in crossing; that the car then struck and bent the southeast end post of the bridge and caromed into the south abutment; that the collapse of the bridge was the direct result of the collision of the plaintiff's car with the end post; and that the hanger plate at point 2 broke, after the collision, as the result of the collapse of the bridge.

■ Viewing the evidence, in support of the plaintiff's claim, in the aspect most favorable to him, and giving him the benefit of all reasonable inferences which can be drawn in his favor as we are required to do (see Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 439; Egan Chevrolet Co. v. Bruner, 8 Cir., 102 F.2d 373, 377, 122 A.L.R. 987; Chicago & North Western Ry. Co. v. Grauel, 8 Cir., 160 F.2d 820, 826), there can be no doubt that he made a case for the jury, unless, as the County contends, his evidence was contrary to physical facts conclusively established or unless the County was entitled to actual, instead of constructive, notice of the alleged dangerous condition of the hanger plate, due to metal fatigue.

■ We think that the County is clearly mistaken in asserting that the statute in suit requires actual notice to the Board of County Commissioners and that evidence of the existence of a patent defect for a period of several years, which, in the exercise of due care, should have been discovered by the County Board, through its superintendent of highways, was insufficient to take the case to the jury on the question of notice.

In Clementson v. Union County, 1934, 63 S.D. 104, 256 N.W. 794, the Supreme Court of South Dakota construed the term "notice" as used in § 8589 of the Revised Code of South Dakota as amended by Chapter 167 of the Laws of South Dakota for 1931. That statute made it the duty of the board of county commissioners of a county to

keep the county highways and bridges safe, and provided that "in case any highway, culvert or bridge shall become, in whole or in part, destroyed or out of repair * * * to such an extent as to endanger the safety of the public, it shall be the duty of such governing body or board, upon receiving notice thereof, to cause to be erected for the protection of travel and public safety, within twenty-four hours thereafter, substantial guards * * *." In the Clementson case it was contended—as it is here—that, in order to recover, the plaintiff was required to prove actual notice to the board of county commissioners of the condition of disrepair which made the highway unsafe for use. The Supreme Court of South Dakota held that the statutory notice might be either actual or constructive.[2] But the County in the instant case argues that the ruling in the Clementson case has been qualified by

Williams v. Wessington Township, supra, 1944, 70 S.D. 75, 14 N.W.2d 493, which involved the same statute with which we are here concerned. The trial court in the Williams case had instructed the jury that:

"The twenty-four hour provision in the statute does not mean that the board, after receiving notice of the defect, could, in all cases, wait until the twenty-four hours had almost expired before erecting the guards, nor under all circumstances must they erect them immediately. But the statute does mean that the board must erect reasonable warnings and substantial guards to protect the traveling public within a reasonable time, not more than twenty-four hours, after having notice of the defect."

The State Supreme Court held that this instruction was erroneous.[3] We cannot tell definitely from the opinion in the Williams case whether the plaintiff in that

---

[2] The court said (page 796 of 256 N. W.):

" * * * Our statute does not expressly require actual notice, and by the great weight of authority it is held that unless actual notice is required by the statute constructive or implied notice is sufficient. Handy v. Meridian Twp., 114 Mich. 454, 72 N.W. 251; Blankenship v. King County, 68 Wash. 84, 122 P. 616, 40 L.R.A.,N.S., 182; Johnson v. [Town of] Iron River, 149 Wis. 139, 135 N.W. 522; Waud v. Polk County, 88 Iowa 617, 55 N.W. 528. The statute of Michigan (3 How.Ann.St. §§ 1446c and 1446d), at the time of the decision of the case of Handy v. Meridian Twp., supra, was almost identical in its requirements as to notice as our section 8589, and the Michigan court in that case held constructive or implied notice met the requirements of the statute. This court has consistently held that independent of statute notice to the governing body of a municipality of a defective condition of a sidewalk is necessary before liability attaches to the municipality for the defect, yet implied or constructive notice has always been held sufficient to meet this requirement of notice. Smith v. City of Yankton, 23 S.D. 352, 121 N.W. 848; Gellenbeck v. City of Mobridge, 40 S.D. 157, 166 N.W. 631; Schuler v. City of Mobridge, 44 S.D. 488, 184 N.W. 281. The plaintiff did show that the highway on which the accident occurred was one of the main traveled roads in Union county, and that the washout or gully had

been in existence for a period of six weeks preceding the accident, and this is sufficient to warrant a jury in finding that the county commissioners had implied or constructive notice of the defective highway, which in our opinion is sufficient upon which to base the verdict."

[3] The court said (page 494, 495 of 14 N.W.2d):

"The argument in support of the instruction is that the statute has brought within the operation of the law of negligence a class of cases not heretofore actionable, and that the general principles of negligence are applicable in the absence of a statutory provision to the contrary. As a general rule, in order to render a municipal corporation liable under the common law for injuries resulting from a defective condition in a street or sidewalk, which it has not itself created or authorized, it must have had knowledge or notice thereof a sufficient length of time before an injury to afford a reasonable opportunity to remedy the condition or to take other precaution to guard against injury. Smith v. City of Yankton, 23 S.D. 352, 121 N.W. 848; Schuler v. City of Mobridge, 44 S.D. 488, 184 N.W. 281; Clementson v. Union County, 63 S.D. 104, 256 N.W. 794. There is in such instances no fixed or definite rule as to what length of time a defect must have existed to furnish notice. Much depends upon the character of the defect and upon the circumstances and surroundings. It is con-

case was relying upon proof of actual or constructive notice, but it reasonably may be inferred that the notice relied upon was not actual, since, if it had been, there would have been no point in the State Supreme Court's saying as it did (page 494 of 14 N.W.2d): "There is in such instances no fixed or definite rule as to what length of time a defect must have existed to furnish notice. Much depends upon the character of the defect and upon the circumstances and surroundings." The quoted language is consistent with the ruling in the Clementson case that the statutory notice may be either actual or constructive, and is inconsistent with the County's contention here that only actual notice will suffice.

■ The County argues that, since the State Supreme Court, in the Williams case, cited cases from jurisdictions where actual notice is required by statute or by judicial decision, that court must be regarded as having receded from the position taken in the Clementson case. But the cases to which the County refers were cited in support of the proposition that "Liability attaches under the statute only when the township board has had notice of the defect at least twenty-four hours prior to the time of injury." It is reasonable to assume that if the State Supreme Court had intended to change its ruling in the Clementson case (of which it was not unmindful, since the case was cited in its opinion), it would have done so explicitly. There is nothing in the Williams case which would warrant us in ruling that the word "notice" as used in the statute in suit does not include constructive notice. Even if this question were a doubtful question of state law—which we think it is not—this Court

would accept the ruling of the trial court as to the meaning of the term "notice". "In deciding what the highest court of a state would probably hold the state law to be, great weight may properly be accorded by this court to the view of the trial court. * * * This court would be justified in adopting a contrary view only if convinced of error. * * *" Magill v. Travelers Ins. Co., 8 Cir., 133 F.2d 709, 713; Russell v. Turner, 8 Cir., 148 F.2d 562, 564; Abbott v. Arkansas Utilities Co. 8 Cir., 165 F.2d 339, 340, and cases cited.

The contention that the plaintiff's evidence is inconsistent with physical facts established by undisputed evidence, is based upon two propositions.

The first is that if the south hanger plate at point 2 had broken before the collapse of the bridge, letting down the south end of the I-beam which it supported, the hanger plate at the north end of this I-beam would necessarily have been bent outwardly, whereas, after the collapse of the bridge, it was found to have been bent inwardly. Without knowing to what movements and stresses the I-beam was subjected while the bridge was in the process of collapsing, we cannot say that the inward bend of the north hanger plate conclusively disproved the plaintiff's theory that the floor of the bridge sagged, while his car was passing over it, due to the breaking of the south hanger plate at point 2. See and compare Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 440. Conceivably at least, the north hanger plate may first have been bent outwardly due to a break of the south plate and afterwards have been bent inwardly by the subsequent movements of the bridge while it was falling.

---

tended in the present case that the statute has limited to twenty-four hours this rule of reasonable notice.

"We are unable to concur in this construction of the statute. The liability is statutory and townships are liable for damages caused by defective highways, culverts or bridges to the extent only that they are made so by statute. There is no common law liability for negligence in this connection. The statute creates the right of action against townships and does not merely modify an existing right. Liability attaches under the statute only

when the township board has had notice of the defect at least twenty-four hours prior to the time of injury. Cf. Brady v. City of Lowell, 3 Cush., Mass., 121; Wagner v. Board of Com'rs, 103 Kan. 719, 176 P. 140, 665; Hurley v. [Inhabitants of] Bowdoinham, 88 Me. 293, 34 A. 72; Allen v. Cook, 21 R.I. 525, 45 A. 148. The instruction given permitted the jury to hold defendant township liable without proof of such notice. It follows that defendant is entitled to a reversal of the judgment. * * *"

The County's second proposition is that, since it is undisputed that, following the collapse of the bridge, the 33 feet of flooring between points 1 and 3 were straight, level, rigid and intact, and were still solidly spiked at the point where the floor stringers overlapped each other at point 2, the floor could not have sagged to the extent indicated by the plaintiff's evidence. That evidence, however, did not compel the conclusion that the sagging or dipping of this 33 feet of flooring was so great as to break the ends of the planks where they were lapped and spiked at point 2. We think that it was for the jury to say whether the physical facts tending to disprove the plaintiff's claim were so inconsistent with the plaintiff's theory as to the cause of the accident as to require a verdict for the County.

The County also asserts that the plaintiff's evidence, which was circumstantial, did not exclude every reasonable hypothesis other than the one which he sought to establish. But if the plaintiff's evidence with respect to events preceding the accident was to be believed, the testimony of his experts as to how and why the bridge collapsed is not unreasonable and furnishes an adequate explanation of the movement of the bridge floor while the plaintiff's car was crossing it. Where inconsistent inferences may reasonably be drawn from evidence, it is for the jury to determine which inference shall be drawn. See and compare Chicago & North Western Ry. Co. v. Grauel, 8 Cir., 160 F.2d 820, 826, and cases cited. We are satisfied that the County was not entitled to a directed verdict at the close of the evidence.

The County contends that the District Court permited the plaintiff to try the entire case upon the theory that a failure of the County to maintain and inspect the bridge would establish liability. The court admitted evidence as to the necessity of frequent inspections of the bridge structure, to insure its safety, but this evidence bore upon the issue of constructive notice. We think that the plaintiff, for the purpose of charging the County with notice of a dangerous and patent defect in the bridge, was entitled to show how frequently, in the exercise of due care, the bridge required inspection. If the evidence had shown that such bridges required no inspection after their original construction or an inspection every five years, the County Board could hardly have been charged with notice of the alleged dangerous defect in the bridge. If there had been no evidence that frequent inspections of such bridges were reasonably necessary, the County could justifiably have asserted that the plaintiff's proof of constructive notice was insufficient.

The County argues that the court in its instructions virtually advised the jury that they might base a verdict against the County upon common law negligence. In its charge the court first instructed the jury as to the liability of the County as follows:

"You are advised that before the plaintiff can recover in the case that, under the statutes of the State of South Dakota, the plaintiff, if he was free from contributory negligence, must, nevertheless, establish by a preponderance of the evidence two things. First, that the bridge was out of repair to such an extent as to endanger the safety of public travel. Second, that the Board of County Commissioners had notice of such condition more than twenty-four hours before the accident, and if plaintiff fails to prove either or both of these things by a preponderance of the evidence, then your verdict should be for the defendant."

The applicable South Dakota statute (§ 28.0913, S.D.C.) was read by the court to the jury. They were told that constructive notice to the Superintendent of Highways was constructive notice to the Board of County Commissioners. The jury were also told that—

"It is undisputed that no barriers were placed across the bridge before the accident, and the undisputed evidence is that at the time of the accident the bridge was open to public travel. Therefore, if you find, under the evidence and the Court's instructions, that at the time of the accident the bridge was out of repair in the respect claimed by the plaintiff, to such an extent as to endanger the safety of public travel, and that by reasonable inspection the county highway superintendent should

have discovered this condition more than twenty-four hours before the accident, and that the accident was the proximate result of this condition, and that the plaintiff was not himself guilty of negligence contributing to the accident, then the plaintiff would be entitled to your verdict."

The court then instructed the jury that if the negligence of the plaintiff either caused or contributed to the happening of the accident, he could not recover. This instruction was followed by a discussion of what constituted common law negligence. The court said, in that connection:

" * * * Before there can be any liability on the county, or any right to recover on his [the plaintiff's] part, he must establish by a fair preponderance of the evidence that the accident which resulted in his injury was proximately caused by the carelessness or by the negligence, by want of due care and caution on the part of the county or its agents, with the responsibility which the law imposes upon them."

This statement of the law was too general in so far as it related to the liability of the County. The County took an exception to this instruction. Thereafter the court gave a further instruction to the jury, reading in part as follows:

"In order to avoid any misunderstanding on the part of the jury I will say to you that wherever I have referred to negligence on the part of the county I mean in their failure to erect this barricade. That is the only negligence alleged in the complaint. That is the only negligence upon which they could be held liable. You will consider any remarks that I have made with reference to negligence on the part of the county as referring to their failure to erect and maintain, according to the requirements of the statute, if under the facts you find them to be such that the statute requires them to establish and maintain a barricade. Your interpretation of anything I have said with reference to negligence on the part of the county should be limited to that particular thing."

No exception was taken to this further instruction, and no assertion was made, at the time, that it was insufficient to cure the defect in the previous instruction at which it was directed. We are of the opinion that the instructions of the court, taken as a whole, correctly limited the liability of the County to that imposed by statute.

The County contends that, during the course of the trial, the court made "persistent rulings * * * which gave appearance of lack of substance on the part of the defense and indicated to the jury that the court was of the opinion that the plaintiff ought to prevail." We think it would serve no useful purpose to list these challenged rulings. Some of them are subject to criticism, but we think that none of them, even if erroneous, rose to the dignity of prejudicial error. See and compare Goldstein v. United States, 8 Cir., 63 F.2d 609, 612–614.

The County challenges many of the court's rulings on evidence. Some of these alleged errors are not argued in the brief. As we have recently pointed out in the case of Kimball Laundry Co. v. United States, 8 Cir., 166 F.2d 856, 859, "An unargued assertion of error is no more helpful to an appellate court than is an unsupported allegation of fact to a trial court. The burden of demonstrating error is upon an appellant, and errors assigned, but not argued in his brief, are waived."

While we think the trial court might well have adopted a more liberal attitude toward the cross-examination of the plaintiff and his witnesses relative to discrepancies between their testimony at the trial and their previous accounts of the accident (see Kroger Grocery & Baking Co. v. Stewart, 8 Cir., 164 F.2d 841, 844), our examination of the record in this case satisfies us that no error justifying a reversal by this Court was committed by the trial court with respect to its rulings on evidence.

The County further contends that counsel for the plaintiff was guilty of misconduct in his closing argument to the jury. The closing arguments of counsel are not included in the record. In London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325, 344, we said:

"In the future, to secure from this court, as a matter of right, a reversal of a judgment because of improper remarks of counsel in an argument made to a jury, the

bill of exceptions *must contain all arguments in full * * *.*"

In the absence of a record containing the closing arguments of counsel for both parties, we think that the remarks of counsel for the plaintiff to which the County took exception were not so objectionable or so obviously prejudicial as to require the intervention of this Court to protect the public interest in the orderly administration of justice. See and compare Kroger Grocery & Baking Co. v. Stewart, supra, pages 844, 845 of 164 F.2d, and cases cited; Chicago & North Western Ry. Co. v. Green, 8 Cir., 164 F.2d 55, 64; Fleming v. Husted, 8 Cir., 164 F.2d 65, 68. We agree with counsel for the County that the remarks should not have been made. We think that counsel for plaintiff jeopardized his client's interests in making them.

■ The County argues that the court erred in instructing the jury with respect to damages. The court advised the jury that they might take into consideration "such damages, if any, as you find he [the plaintiff] is reasonably certain to experience in the future by reason of his injury, including loss of earnings, impairment of normal activities, pleasures and recreation, necessity, if any, of future care, and all elements constituting future loss." The court also charged the jury:

"The requirement that future damage must be shown with reasonable certainty does not mean that such damages must be proved with absolute certainty or beyond any possible doubt. It means that future damages, if any, must be shown by such proof that you are satisfied they are reasonably certain to occur."

Section 37.1702 of the South Dakota Code reads as follows:

"Damages may be awarded in a judicial proceeding for detriment resulting after the commencement thereof, or certain to result in the future."

It is argued by the County that the instruction of the court qualifies the plain language of this statute; that the court's instructions permitted the jury to allow uncertain and speculative damages. No South Dakota case in which a like instruction was disapproved by the State Supreme Court has been called to our attention. The question whether the statute requires absolute certainty or reasonable certainty of future "detriment" is apparently one of those doubtful questions of state law with respect to which this Court may properly defer to the view of the District Court. It should, perhaps, be said that there was little uncertainty as to the nature or extent of the plaintiff's injuries. These included the loss of one arm and the virtual loss of the use of the other.

■ The County's assertion that the verdict is excessive raises no question which this Court has power to review. Kroger Grocery & Baking Co. v. Yount, 8 Cir., 66 F.2d 700, 705, 92 A.L.R. 1166, and cases cited. The motion of the County for a new trial on this and other grounds was addressed to the discretion of the District Court, and the denial of the motion is not subject to review by this Court. Elzig v. Gudwangen, supra, page 436 of 91 F.2d, and cases cited.

We think that if any substantial error was committed in this case, it was an error of fact attributable to the jury, with which this Court may not concern itself. See Elzig v. Gudwangen, supra, page 444 of 91 F.2d.

Errors asserted by the County which are not referred to in this opinion have not been overlooked, but are thought to merit no discussion.

The judgment is affirmed.